UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LATONIA GROVES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:13-CV-086 JD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Latonia Groves' Complaint [DE 1] filed

February 11, 2013, seeking to reverse the decision of the Commissioner of Social Security

("Commissioner") or remand for additional proceedings. Groves filed her opening brief [DE 18]

on August 27, 2013. The Commissioner submitted a response [DE 26] on January 24, 2014.[2]

Groves filed a reply [DE 27] on February 7, 2014, and the matter is now ripe for ruling.

## I.  Procedural History

Groves filed for disability insurance benefits with the SSA on August 12, 2010. (R. 134–

35). She was initially denied benefits on December 3, 2010. (R. 66). She was denied benefits

upon reconsideration on February 8, 2011. (R. 67). Groves requested a hearing before an

administrative law judge ("ALJ") on February 17, 2011. (R. 83–84). Her request was granted.

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action.  No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] The Court notes that the delayed briefing schedule was caused by the stay which was entered at the request of the Commissioner on account of a lapse of appropriations for the Social Security Administration ("SSA"). [DE 19, 20, 22–25].

(100–04). The hearing took place in person before ALJ William Sampson in Valparaiso, Indiana, on December 8, 2011. (R. 35–37). The ALJ issued an unfavorable decision on January 20, 2012. (R. 22–30). Groves' request for Appeals Council review was denied on October 22, 2012, rendering the ALJ's decision the final action of the Commissioner. (R. 6–10). Groves filed her Complaint with this Court, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.  Factual Background

### A.     Overview

Groves was born Latonia Green on August 1, 1974. (R. 134).  She was thirty-seven years old the day ALJ Sampson issued his unfavorable decision. Groves stands about five feet, five inches tall, and her weight has fluctuated between 200 and 261 pounds since January 2009. (R. 301–04, 204, 550–51).[3] Groves is married and has one child who was twelve years old at the time of her hearing. (R. 44). She worked full-time from 1995 to 2010, first as an injection press operator until August 2002, and then as a dental assistant. (R. 156). As a dental assistant she worked primarily with children, specifically holding children during dental procedures, and she hurt her back while holding a child in July of 2009. (R. 282–83). Groves continued to work intermittently until March 29, 2010, but has not worked since. (R. 155).

### B.     Medical History

On July 8, 2009, Groves saw Arnold del Pilar, M.D., an osteopathic physician, with complaints of pain in her neck and left arm with tingling in her fingers; she weighed 214 pounds. (R. 292–93). The same day, Timothy Olthoff, M.D., took x-rays of her neck and found an unremarkable appearance of the cervical spine. (R. 348). On September 9, 2009, Groves saw

---

[3] Groves was last reported to be five feet, three inches tall (R. 704) which could be on account of post-surgery changes.   This two inch reduction in height would result in slight increases in the value of Groves' body mass index, but the majority of her medical records list Groves as five feet, five inches tall, and Groves relies on the same height measurement.

Tamera Andrews, FNP, with the same symptoms; her arm pain was rated a five out of ten, and an eight out of ten at its worst. (R. 290). She received a splint for her left wrist and reported the splint helped but she wanted to see a specialist. (R. 288).

Groves saw Randolph Ferlic, M.D., an orthopedic surgeon, on December 3, 2009. (R. 203). Her hand numbness was mild to moderate, and it interfered with some of her daily activities. (R. 203). She had sleep problems, unintentional weight gain, swollen ankles and legs, nausea, joint pain and stiffness, and she weighed 200 pounds. (R. 203–04). Dr. Ferlic prescribed Ultram (Tramadol). (R. 205). On December 7, 2009, Groves asked Dr. Ferlic for a note clearing her for a return to work as of November 30, 2009. (R. 201). On December 11, 2009, Ian Markley, M.D., performed an electromyography ("EMG") study. Dr. Ferlic discussed the results of the EMG with Groves on December 15, and his impression was mild left side carpal tunnel syndrome, associated with a left arm strain in an otherwise healthy dental assistant. (R. 200). Dr. Ferlic prescribed occupational therapy ("OT"), and considered a CT injection. (R. 200).

On December 17, 2009, Groves began OT and attended four sessions from December 17, 2009 through January 14, 2010. (R. 208, 219). On December 22, 2010, Groves reported feeling much better, with a little pain remaining, but less pain while walking. (R. 221). She was discharged from OT "per physician" on February 2, 2010 (R. 208), and Dr. Ferlic noted that the OT benefits were only transient. (R. 198). Groves continued to have complaints of worsening left arm and hand pain, and Dr. Ferlic noted her symptoms were "not classic" for carpal tunnel syndrome. (R. 207-08). He referred Groves to James Sieradzki, M.D., an orthopedic shoulder surgeon, for a specialist's opinion. (R. 198). On February 11, 2010, Groves was still in a lot of pain, and had to take two days off from work. (R. 195).

On February 19, 2010, Groves saw Dr. Sieradzki and reported mild lateral neck pain on the left side only, left shoulder pain, and numbness in her fingers. (R. 192-5). Dr. Sieradzki reported a positive Hawkin's and Neer's test with pain resulting from each, which indicated the need to rule out a left rotator cuff impingement. Dr. Sieradzki gave her a cortisone injection in her left shoulder, and recommended an OT program for her left shoulder. Groves saw Dr. Sieradzki again on March 19, 2010, and reported having shoulder pain which moved into her neck. (R. 188-89). The cortisone injection helped somewhat, but she also took ibuprofen for pain. Two views of her cervical spine revealed mild degenerative changes at C5–C6.

Groves drove herself to the emergency room on March 28, 2010, with lower back pain which rated a ten out of ten and was worse with movement. (R. 226). She weighed 210 pounds, had increased discomfort moving her neck, and a straight leg raise test resulted in pain in her lower back. (R. 226). David Halperin, M.D., diagnosed her as having an acute lumbar strain and told her to not work until she saw Dr. del Pilar. (R. 226).

Groves saw Dr. del Pilar on March 31, 2010; she stated her back pain resulted from a work injury on July 1, 2009. (R. 282). She rated her pain at a ten out of ten, but she appeared to be in no acute distress. (R. 282). Groves weighed 219 pounds, her Spurling's test (to evaluate cervical root impingement), Phalen's test (to assess carpal tunnel syndrome), and Tinel's test (also to test for carpal tunnel syndrome) were all positive. (R. 282–83). Her back pain made it hard to walk, sit, or bend, and caused her legs to go numb. Dr. del Pilar ordered cervical and lumbar MRI exams that Mary Dynes, M.D., performed the same day. (R. 283, 344–46). Dr. Dynes reported mild degenerative disc disease at L4-L5 and an extruded disc herniation causing focal compression of the right ventral thecal sac along the medial margin of the right L4 nerve root. (R. 344). There was mild facet arthropathy at L4-L5. (R. 344). As to the cervical spine, Dr.

Dynes' impression was that Groves had multi-level cervical spondylosis with a mild disc bulge at C5–C6, and a moderate disc bulge at C6–C7 with associated mild to moderate canal stenosis. (R. 345–46).

On April 1, 2010, Dr. del Pilar diagnosed cervical and lumbar radiculopathy and gave Groves an epidural at L4. (R. 281). On April 8 and 15, 2010, Groves received epidurals at L5 (R. 276–79). Groves saw Dr. del Pilar on April 22, 2010, and received an epidural, this one at C5–C6 and C6–C7. (R. 274–75). Groves received another epidural steroid injection at L5–S1 on May 18, 2010. (R. 339).

Groves was referred to Kirnjot Singh, M.D., an orthopedic spine surgeon, after the epidurals and OT failed to relieve her pain. (R. 272). Dr. Singh recommended cervical discectomy and fusion for her neck problems, and for her low back he recommended OT, a back brace, a TENS unit, and continued non-surgical therapy, but left open the possibility of future lumbar spine surgery. (R. 273).

Dr. Singh performed an anterior cervical discectomy and fusion on May 21, 2010. (R. 231).[4] After the procedure, Groves ambulated without problems, her left arm strength returned to normal, she had no pain in her left arm, and she was discharged in good condition on May 22, 2010. (R. 231). Dr. Singh prescribed Vicodin for pain, one or two every four to six hours. (R. 231, 439). Michael Grantham, M.D., performed a follow-up x-ray on June 7, 2010; his impression was stable post-operative changes. (R. 266). On June 8, 2010, Groves saw Dr. Singh, and reported her arm symptoms were completely gone with some soreness in her shoulder. (R. 446). However, Groves continued to experience lower back pain with pain into her left leg. (R. 445). Physical therapy was recommended for her back. (R. 443-44).

---

[4] A narrative of the procedure indicates that the operation involved decompressing nerve roots, inserting biomechanical spacers between the vertebrae, decortication of the endplates "to bleeding bone;" and inserting two screws into the C6 and the C7 vertebrae. (R. 236–37).

On July 6, 2010, David D'Andrea, M.D., performed an x-ray on Groves' cervical spine, and found a stable appearance of anterior fusion of C6 and C7. (R. 263). Groves had an x-ray of her lumbar spine performed by Thomas Seiffert, M.D., on July 21, 2010. (R. 260). Dr. Seiffert compared these x-rays to her March 28 x-rays and his impression was mild intervertebral disc space narrowing at the L4–L5 disc space. (R. 260).

Groves saw Dr. Singh on July 21, 2010, for a follow-up visit. (R. 453). He stated that she was "doing outstanding" and that both her neck and her left arm were feeling great, but that she still had pain in her lower back and left leg. (R. 453). Groves reported taking three Vicodin per day, but wanted treatment for her lower back so she could return to a normal life. (R. 453). Groves saw Dr. Singh again on July 28, 2010, with severe back pain and pain which radiated down her left leg to her foot. (R. 454). She described her left arm as "perfect." (R. 454). Dr. Singh discussed two surgical options with Groves; an endoscopic discectomy, and a laminectomy with fusion. (R. 454).

Dr. D'Andrea x-rayed Groves' neck on August 9, 2010, and compared the images to the ones taken on July 6. (R. 256). Dr. D'Andrea still found a stable appearance of the anterior fusion of C6 and C7. (R. 256). The same day, Eldon Olson, M.D., took an x-ray of Groves' lumbar spine and reported the disc spaces were well maintained, with no misalignment with flexion or extension. (R. 256–57).

On August 10, 2010, Groves underwent a lumbar discography and a CT scan of her lumbar spine. (R. 456–59). Joseph Glazier, M.D., performed the discography, and his impression was positive discogram with high confidence at L5–S1 and medium confidence at L4–L5, but a seemingly normal disc at L3–L4. (R. 456–47). Gregory Hord, M.D., performed the CT scan following the discogram, and found a loss of disc height at L4–L5 with a central disc extrusion

associated with an annular tear, but no significant disc bulge or herniation at L5–S1 and no annular tear or spinal stenosis. (R. 458).

Groves was discharged from the care of physical therapist Blair Johnson on August 16, 2010. The discharge notice indicated Groves kept all nine of her physical therapy appointments for her back pain. (R. 532). Johnson reported Groves had "improved" with pain reduction, and with her ability to sit, stand, and walk for an hour, but her hip abduction goal remained "unmet." (R. 532). The notes indicated almost every session made Groves' back and left leg pain worse, and that pool exercises occasionally caused an increase in pain. (R. 532).

On August 25, 2010, Dr. Singh stated that Groves' neck and arm pain was resolved, with some stiffness in her neck, and that Groves elected to proceed with an anterior-posterior fusion surgery in her lumbar spine. (R. 463). Groves saw Dr. del Pilar for pre-operative clearance on August 30, 2010, at which time Groves reported a pain score of seven out of ten, and Dr. del Pilar noted Groves appeared to be in obvious severe pain. (R. 352). The physical exam revealed significant tenderness over her lumbar spine; decreased range of motion with flexion, extension, bending, and twisting; and a positive straight leg raise test on the left. (R. 353).

On September 13, 2010, Drs. Singh and Glenn Carlos performed an anterior exposure for spinal fusion surgery, and a bilateral laminotomy and foraminotomy at L4–L5 and L5–S1; a posterior spine fusion from L4 to S1; a segmental lumbar instrumentation from L4 to S1; a posterior iliac bone graft through a separate fascial incision; and an allograft bone fusion. (R. 356–59, 366–72). After surgery, Groves spent three days in the hospital and before she was discharged she could walk more than fifty feet and her pain was well-controlled with oral pain medications. (R. 354).

On October 9, 2010, Groves saw Crystal Strong, M.D., a state agency examining physician, for a disability evaluation. (R. 394–97). Dr. Strong's notes are detailed separately below. *See infra, subsection D.*

On October 26, Brett Stevens, M.D., performed an x-ray of Groves' lumbar spine. (R. 589–90). Dr. Stevens' impression was a slight curvature of the lumbar spine, with no acute abnormalities identified, and post-operative changes of a lower lumbar fusion. (R. 589). Douglas Kuehn, M.D., performed another x-ray on November 23, 2010, and noted no changes since the October 26 x-ray. (R. 588).

On December 21, 2010, Drs. Hord and Olthoff performed a CT scan of Groves' lumbar spine. (R. 649). They found intact fusion hardware and disc spaces, a mild disc bulge at L3–L4 with mild neural foraminal narrowing, and no significant central canal stenosis. (R. 649).

Groves saw Dr. Singh on January 5, 2011, with complaints of left leg numbness, but otherwise she was recovering well from surgery. (R. 548). Dr. Singh directed Groves to begin physical therapy ("PT"). (R. 548). On January 6, 2011, Groves underwent an initial PT evaluation with physical therapist Shanti Shrestha (R. 528–29). The evaluation noted that Groves had a pain score of seven out of ten. (R. 628-29). Her pain increased with lying on her left side, and standing, walking or sitting for more than ten minutes. The pain in her lower back and left buttock and thigh was constant, but pain medications and heat therapy helped the pain. She had occasional burning and throbbing in her left calf, constant numbness and tingling in her left foot, and she used a cane to walk when the pain was severe. She had not worked since March of 2010, but wanted to return to work eventually.

Groves had decreased weight bearing on her left leg and decreased left hip extension. (R. 628-29). Her active range of motion was within functional limits for both legs, but she had

tightness in her left hamstring and calf. Groves had decreased strength in both legs and experienced back pain with resistance tests, but no increase in lower back pain during the straight leg raise test. Her maximum tolerable load, with increased pain, was seventy pounds. She had diminished sensation to light touch in her left leg.

By March 10, 2011, Shrestha recorded a thirty-day progress note for Groves indicating that Groves had improved toward all of her goals except for being able to sleep without being awoken by pain. Groves no longer used her cane constantly, her pain levels sometimes were as low as two out of ten but could still be a ten out of ten, she still felt weak going from sitting to standing, and she was able to walk for fifteen minutes, but her pain increased after ten minutes. (R. 519-29). Shrestha's assessment was that Groves was slowly progressing toward her goals, and planned on seeing Groves 2–3 more times before discharging her from PT. (R. 520). Groves attended another PT session on March 16, 2011, and the notes indicate she was doing "OK" since her last treatment. (R. 519).

On March 28, 2011, Groves was admitted to the ER with slurred speech and left-sided weakness. (R. 581–87). Her grip strength appeared to be equal on both hands and she had definite weakness in her left leg, but a normal gait. An MRI of her brain by Katrina Vanderveen, M.D., showed normal appearances of all structures, but two small areas of abnormal signal intensity, which was normally consistent with migraine headaches, vasculitis, or demyelinating processes. (R. 575).[5]

Groves saw Dr. Singh for a follow-up visit on May 25, 2011, at which time she reported continued back pain and left leg pain. (R. 535). Groves was taking Vicodin twice a day, and

_____

[5] Additional examinations included: an x-ray of her chest that revealed no signs of acute disease or change from her May 17, 2010 x-ray (R. 581); a CT Scan of her brain which revealed no acute ultracranial pathology (R. 582); and a carotid Doppler ultrasound which showed minimal plaque in the left carotid artery, and no hemodynamically significant stenosis (R. 577).

occasionally taking weight loss pills. Dr. Singh noted that Groves was "pretty much baseline," and that he "saw no reason to do further imaging."

On June 21, 2011, Dr. Stephens performed an x-ray on her cervical spine. (R. 573). His impression was that the fusion appeared satisfactory. (R. 573). On June 22, 2011, Groves saw Dr. Singh and while she had no complaints of pain in her neck or her arm, she still had pain in her lower back that radiated down her left leg. (R. 615). Dr. Singh ordered an EMG study to assess the nerves in her legs.

Russell Midkiff, M.D., conducted the EMG study on August 4, 2011. (R. 621–22). Dr. Midkiff noted that motor testing was limited by Groves' pain and that a straight leg test with the left leg provoked "marked low back pain radiating into the left lower extremity." (R. 621). Despite the fact that there was no apparent muscle atrophy in the left leg, there was marked tenderness in the left lower back and sacroiliac region, and diffuse tenderness in the left leg, especially the posterior thigh. (R. 621). Dr. Midkiff's impression of the EMG was an essentially normal EMG in the selection of left leg muscles, with no electrodiagnostic evidence for active radiculopathy or other neuromuscular abnormality in the left leg. (R. 622).

When Groves saw Dr. Singh on August 17, 2011, she had continued complaints of pain in her back and down her left leg. (R. 617). Groves reported that she was taking two or three Vicodin per day. Dr. Singh's physical examination of Groves was normal, and he opined that at one year post lumbar surgery and a year and a half post cervical surgery all of the objective evidence pointed towards completely healed fusions of her neck and spine, and that he and his associates could "find no objective source of her pain." Dr. Singh decided to discharge Groves from his care, and gave her referrals to four chronic pain management physicians, including Dr.

Landrum.  Dr. Singh also noted, "[a]t this point, I cannot help to think of possible secondary gain issues considering her extensive time off from work." (R. 617).

On September 1, 2011, Groves saw Dr. del Pilar for pain, numbness, and weakness in her left leg, and to discuss weight management; Groves weighed 250 pounds. (R. 559). She reported that her pain rated a nine out of ten.  Dr. del Pilar performed a venous Doppler ultrasound on both of Groves' legs and found no evidence of deep vein thrombosis in either leg above or below the calf level.[6] (R. 561). Groves returned to Dr. del Pilar for a follow-up on September 6, 2011, at which time she weighed 261 pounds and walked with a cane. (R. 551).

On September 21, 2011, Groves saw Orlando Landrum, M.D., chronic pain management specialist, for a consultation with a chief complaint of lower back pain. (R. 632-33). Dr. Landrum recorded Groves' description as lower back pain with left radicular symptoms, with sharp pain in the lower back, left hip, thigh, knee, ankle, and foot.  Groves reported relief with heat, massage, or lying in a supine position, and aggravation with standing, walking, or sitting. Groves weighed 256 pounds. She reported a pain rating of eight out of ten, with a fifty percent improvement with use of medication.

On October 5, 2011, Groves returned to see Dr. Landrum and reported suffering from leg cramps and weakness, difficulty walking, joint pain, joint swelling, back pain, frequent headaches, difficulty concentrating, poor balance, numbness, tingling, anxiety, and sudden weight gain. (R. 634-36). Dr. Landrum prescribed Neurontin (Gabapentin) and documented abnormal spinal tenderness to palpitation and positive straight leg raise test on the left leg while lying down and sitting. (R. 636). Dr. Landrum's assessment was low back pain syndrome.

---

[6] Deep vein thrombosis is a blood clot that forms in a vein deep in the body. Blood clots occur when blood thickens and clumps together. *National Institute of Health*, http://www.nhlbi.nih.gov/health/health-topics/topics/dvt/ (last accessed August 18, 2014).

On October 19, 2011, Groves returned to Dr. Landrum for a pain management visit. (R. 637-40). Groves reported pain that rated a six out of ten and that she was taking three to four Vicodin per day, which provided relief for up to three hours until she began experiencing burning, cramping, and pain in her left leg. Groves also reported constant throbbing in her neck, and occasional sensations in her left arm. Groves reported that Neurontin caused sleepiness so she only used it as needed for her lower back pain. Dr. Landrum replaced her Vicodin 5-500 mg with Norco 7.5-325 mg to be taken as needed for pain, and added a prescription for Ibuprofen 800 mg to be taken as needed for pain. Dr. Landrum's assessment was that Groves experienced stiffness and pain in her neck with certain movement extremes, and considered ordering another CT scan of Groves' lumbar spine along with a bilateral epidural steroid injection at L3-4.

On November 16, 2011, Groves saw Dr. Landrum, and asked to have paperwork completed indicating that she could not return to work. (R. 641). She rated her pain at a ten out of ten, and reported that Norco did not relieve her pain for very long, she needed to walk with a cane, and she could not sit or stand for any length of time. Dr. Landrum's assessment was radiculopathy of the lumbar spine. (R. 643–44). Her treatment options included further surgery or steroid injections. For the time being, Dr. Landrum prescribed a narcotic pain patch that delivered fifty mcg of fentanyl per hour and he switched the Norco to Vicodin 7.5 and replaced Neurontin with Gralise.

On November 28, 2011, Groves saw Dr. Landrum and reported a pain rating of seven out of ten, which required her to stand during the intake evaluation. (R. 645). She reported Vicodin was making her nauseous and asked for something to help control the nausea when she took Vicodin. Dr. Landrum assessed that Groves' pain was adequately controlled by pain medications

at the moment, so he would not increase her dosing, and recommended a surgical evaluation with Michael Hartman, M.D. (R. 648).

On January 14, 2012, Groves was admitted to the ER with complaints of right-sided weakness, left leg weakness, and slurred speech. (R. 658). A CT scan of her brain resulted in an unremarkable examination. (R. 665–66). On January 15, 2012, Devin Zimmerman, M.D., performed a consultative examination and noted that Groves' condition may have "a psychological overly." (R. 658). Groves' speech was very halting and stuttering, but she was able to get her words out eventually. (R. 661). As to station and gait, Groves' left leg remained partially collapsed when she walked, but had good strength and balance. (R. 661). Dr. del Pilar noted that Groves complained of chronic low back pain and neck pain. (R. 658). Dr. del Pilar also noted that Dr. Zimmerman believed Groves' left-sided weakness was inconsistent with her neurological pattern and questioned whether she suffered from Munchausen's syndrome. (R. 659). Groves was evaluated by physical therapist Lori Pelletin, M.P.T., on January 16, 2012. (R. 675). Groves reported that she walked with a single point cane, and she complained of back pain that radiated down her left leg. Pelletin assessed decreased coordination, weakness on both sides with greater weakness on the right, and impaired functional mobility. Upon discharge three days later, Dr. del Pilar started Groves on Plavix and recommended that she stop taking Vicodin and using the fentanyl patch for the next week. (R. 657).

On January 14, 2012, a color Doppler ultrasound of the carotid arteries detected no abnormalities, and a CT scan of her brain was unremarkable. (R. 666–67). On January 16, 2012, Albert Cho, M.D., performed an MRI on Groves' brain and found no significant changes in the images since the MRI taken in March of 2011. (R. 668–69).

An OT acute care evaluation form was completed on January 17, 2012. (R. 677–78). This evaluation indicated Groves was able to manage medications by herself. In a typical day Groves performed activities of daily living independently, but she required a cane for functional mobility over longer distances. She had trouble sitting up to eat, needed minimal assistance standing at the sink while grooming, and had difficulty getting dressed or walking due to balance concerns. Groves had impaired trunk mobility due to back pain, impaired arm strength bilaterally with more weakness in the right arm, impaired muscle tone, and impaired coordination. She had impaired sensation due to numbness and tingling, and pain in her neck, back, and leg that she rated at a six out of ten. She was able to follow one to two step commands but was slow at times, and her attention span was impaired because she was distracted by her pain. She had impaired problem solving and motor planning due to slowness.

Monique Conner completed a speech and language pathology initial evaluation on January 17, 2012. (R. 679–80). Groves had impaired speech fluency and Conner recommended a full speech therapy evaluation and treatment in either an in-patient or out-patient setting. (R. 680).

Groves saw Suying Wu, M.D., a neurologist, on March 19, 2012, for cervical radiculopathy, lumbar radiculopathy, and migraine headaches. (R. 692). Dr. Wu suspected that Groves' daily headaches were caused by her cervical spine issues, and noted that a complex migraine would be controlled by Relpax because Topamax made Groves cry and feel depressed. (R. 692). Dr. Wu also prescribed Nortriptyline HCL 25 mg for cervical radiculopathy and migraines, and ordered an EMG. (R. 692).

On March 22, 2012, Dr. Dynes took an MRI of Groves' cervical spine and compared it to the MRI from March 31, 2010. (R. 690). Dr. Dynes' impressions were no canal stenosis or

residual disc bulge at C6–C7, and that at C5–C6 there was mild cervical spondylosis with tiny broad-based central disc protrusion, but without significant canal stenosis and no definite nerve root impingement or significant neural foraminal narrowing. (R. 691).

On March 28, 2012, Dr. Wu conducted an EMG which he believed showed abnormal results suggesting left wrist carpal tunnel syndrome, left side C7, C8–T1, L3–L4, L4–L5, and L5–S1 subacute to chronic radiculopathy.

On April 18, 2012, Groves saw Dr. Wu for a follow-up visit. (R. 704). Groves stated that she fired Dr. del Pilar.  At the time, Groves measured five foot, three inches tall, she weighed 241 pounds, and her medications included: D2000 Ultra Strength three times a day, Furosemide 20 mg once a day, Promethazine HCL 25 mg every four to six hours as needed, Plavix 75 mg once a day, Topiramate 100 mg once a day, Diclofenac Sodium 75 mg twice a day, Relpax 40 mg once in the morning and as needed after two hours, Norco 10-325 mg once every six hours as needed, MS Contin 30 mg twice a day, Gralise as directed, Nortriptyline HCL 25 mg once at night for neck pain, and an Excedrin Migraine as needed for headaches but no more than three per week. (R. 706). Groves did not appear to be in any acute distress. Her speech and language functions were intact. (R 707). Her gait was normal with an intact stride, arm swing, and posture, but she had left leg weakness. She had decreased sensation on all of the left side of her body. Dr. Wu was not sure if Groves suffered from complex migraines or anxiety attacks because she had slurred speech when she became anxious.  As for Groves' cervical radiculopathy, Dr. Wu referred her to Dr. Hartman for a second opinion. (R. 708). Relative to her hypertension, Groves was referred to Dr. Enriquez.

**C.      Physical Capabilities Assessments from Drs. Singh & Landrum**

On February 22, 2011, Dr. Singh filled out an attending physician statement for MetLife. (R. 540–43). His primary diagnoses were status post cervical fusion; spinal stenosis in the lumbar spine; and kyphosis. His secondary diagnoses were disorder of the sacrum; degeneration of the lumbar spine; and disc disorder of the lumbar spine.  He relied on x-rays and CT scans, and noted that Groves still complained of back pain radiating down her leg. He opined that Groves could sit for one hour continuously, stand and walk for one hour intermittently, and occasionally lift up to ten pounds; that she could not climb, twist, bend, or stoop, but she could reach above her shoulder and drive a motor vehicle. She could perform fine finger movements and hand-eye coordinated movements repetitively with both hands, but could not push or pull with either hand.  Dr. Singh believed that Groves could not work based on her status post cervical and lumbar fusion.

On May 20, 2011, Dr. Singh filled out a physical capabilities evaluation for Groves. (R. 533–34). His assessment of Groves had improved in part. On this form he indicated Groves could sit for a total of two hours in an eight hour work day, and also stand and walk for a total of two hours, but needed the opportunity to alternate between sitting and standing at will. Groves still could not use either hand for pushing and pulling, or complete repetitive motion tasks such as writing, typing, or assembling. Groves also could not use either foot for repetitive movements, such as operating foot controls. She could now lift or carry up to five pounds frequently, and between six and twenty pounds occasionally. She could occasionally balance and reach above shoulder level, but her other postural restrictions remained. Groves was totally restricted from work involving unprotected heights and moving machinery, severely restricted from driving automotive equipment, and moderately restricted from activities exposing her to dust, fumes,

gases, and marked changes in temperature or humidity. Dr. Singh also indicated that Groves'

pain was "severe" meaning it precluded the attention and concentration required for even simple

unskilled tasks.

On November 30, 2011, Dr. Landrum provided an attending physician statement on a

MetLife form. (R. 650–53). His primary diagnosis of Groves' condition was lower back pain

syndrome. Dr. Landrum opined that Groves could intermittently sit, stand, or walk, she could

not climb, bend, twist, stoop, reach above her shoulder, operate a motor vehicle, lift and carry

any weight, or perform repetitive pushing and pulling movements with either hand. She could

perform fine finger movements and eye-hand coordinated movements with both hands. Dr.

Landrum stated that improvement of her condition was possible with intervention or surgical

treatments, and recommended Groves pursue PT, pain management, and interventional

treatment.

Dr. Landrum also filled out a physical capabilities evaluation on November 30, 2011. (R.

626–631). He indicated that Groves could sit or stand/walk for less than one hour each in an

eight hour day, and she needed to be allowed to alternate between sitting and standing. Dr.

Landrum further opined that Groves could not use either hand for simple grasping, repetitive

movements, or pushing and pulling, and she could not use her feet to perform repetitive

movements. He indicated that Groves could only lift and carry up to five pounds occasionally

during an eight hour workday. He opined that Groves could never climb, balance, stoop, kneel,

crouch, or crawl, or reach above shoulder level. He totally restricted Groves from environmental

hazards. Dr. Landrum reported that Groves suffered from low back pain syndrome, and opined

that it prevented full time work (even sedentary work), and moderately affected her attention and

concentration which eliminated skilled work tasks. He noted that Groves needed to change position or posture more than once every two hours, and that she could not ambulate effectively.

**D.      State Agency Examiner**

On October 9, 2010, Crystal Strong, M.D., performed a consultative examination for the purpose of a disability determination. (R. 394–97). Groves had pain in the left side of her lower back, both legs, and her neck, with numbness in her left foot and right thigh.  Her pain improved after surgery, but still persisted.  She used a walker off-and-on since surgery because weakness in her left leg caused problems with strength and balance.  She stated she could dress and feed herself, stand for fifteen minutes at a time, stand for a total of one hour in an eight hour day, walk one block, and sit for one hour.

The objective exam revealed Groves' range of motion in her cervical spine was decreased, and the rest of her spine was not tested due to her recent lumbar surgery. (R. 393–95). Groves was five-feet, four-inches tall, and weighed 237 pounds. Dr. Strong noted Groves was in no acute distress while resting, she walked with the assistance of a back brace, and she had a left side limp with a mild to moderate impairment in her gait. Groves was able to dress herself, take her shoes on and off, get on and off the exam table, and get in and out of a chair without difficulty.  Groves had a negative straight leg test with both legs, she was able to walk on her heels and toes, and able to squat. (R. 396). Neurologically, Groves had decreased power in her left thigh and left ankle with dorsiflexion.

Dr. Strong's impressions were that Groves was cooperative, with no limits on her communication; her back brace was only necessary for walking, but a cane may be necessary on uneven terrain; she had no limits on her ability to reach, handle, grasp, or manipulate objects with either hand; and no limits on her ability to sit, stand, and walk. (R. 397). Dr. Strong also

noted that Groves had an eight pound lifting restriction which needed to be re-tested once she was cleared by her surgeon, and that "[h]opefully she will be able to return to normal lifting parameters." Dr. Strong suspected that Groves' left leg weakness was caused by an underlying neurological issue that had also manifested itself in her speech problems and history of facial weakness.

### E.     State Agency Non-Examiner

On December 2, 2010, J.V. Corcoran, M.D., completed a physical residual functional capacity ("RFC") assessment[7] for Groves based on a primary diagnosis of cervical discectomy and fusion, and a secondary diagnosis of lumbar disc herniation. (R. 507-14). Dr. Corcoran opined that by March 22, 2011 (one year post-cervical fusion surgery), Groves could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk for about six hours in an eight hour work day, sit with normal breaks for about six hours in an eight hour workday, and had an otherwise unlimited ability to push and pull with her hands and feet. (R. 508). Dr. Corcoran based this opinion on Groves' age, body mass index, May 22, 2010 surgery, the objective evidence that showed stable fusion, and Dr. Strong's physical exam.

Dr. Corcoran opined that Groves was restricted to occasionally stooping, kneeling, crouching, crawling, and climbing ramps or stairs; and she could never climb ladders, ropes, or scaffolds. (R. 509). She could balance frequently. No manipulative, visual, or communicative limitations were established, but she needed to avoid concentrated exposure to vibrations, dangerous machinery, and unprotected heights. (R. 510–11). Dr. Corcoran found that Groves was credible. (R. 512).

On February 7, 2011, J. Sands, M.D., affirmed Dr. Corcoran's decision. (R. 515).

---

[7] Residual functioning capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

**F.      Hearing Testimony**

At the December 8, 2011 hearing, Groves and Vocational Expert ("VE") Thomas Gusloff testified, and Groves was represented by Jeff Bares, a non-attorney. (R. 37–38). Groves testified that she stopped working as a dental assistant in March of 2010. (R. 39). As a dental assistant, she had to hold children during dental procedures, and while holding a child down she herniated her cervical spine and lost movement and feeling in her left arm and fingertips.

As to activities of daily living, Groves drove her son to and from school, but other than that her husband drove because she had trouble with turning her head to the right and left. (R. 43).  She had trouble with bending down and clasping buttons, but she did not have trouble with zippers as long as the zipper was easy to grab. (R. 44). She did not normally sleep well because her pain would wake her up, and then she either remained in bed or took prescribed pain medication in order to feel comfortable. (R. 44). Her normal day consisted of getting out of bed and getting dressed, usually in pajama pants, driving her son to school, and then returning home. (R. 45). She sometimes ate breakfast and then she would lie down.  She did not vacuum, dust, grocery shop, or wash clothes; but she could prepare food for dinner in the slow cooker. (R. 46). She took showers, but she had trouble washing her hair because it was painful to hold her hands up for an extended period of time. (R. 47). Before her injury she never had any problems with depression or crying, but since 2009 her lifestyle had changed and she was unable to care for her son and her husband as she had before.

Groves experienced burning down her neck and a lot of weakness in her left arm that prevented her from working at a job where she had to be seated all of the time. (R. 50).  Her foot also swelled which required her to lie down for six hours each day in order to elevate her foot and to take the pressure off of her back. (R. 51–52).  She could only stand for about ten minutes

20

before the pain hurt so bad she would be in tears. (R. 56–57). Groves indicated that she used her cane all of the time, even when just standing because it helped her balance. (R. 56, 61). She testified that both Dr. Singh and her physical therapist told her to use the cane. (R. 48–49).

Her medications helped with her pain, but she could still feel the burning down her neck, back, and leg. (R. 51). Her medications also caused extreme nausea and drowsiness. (R. 51). She could not concentrate on things because she focused on her pain. (R. 51). She attended physical therapy, but still had pain and loss of strength. She stated that water therapy helped because she could do more movements for balance and strength than she could perform out of the water. (R. 48). She confirmed that she had no other health problems other than anxiety, depression, and extreme pain. (R. 53–54).

VE Gusloff testified that Groves' work as a dental assistant was skilled work that was generally performed as light work, but was actually performed at the medium exertional level. Groves' work as a belt press operator was semi-skilled work that was generally and actually performed as heavy work.

The VE then provided responses to the ALJ's hypothetical questions which involved an individual of Groves' age, education, and experience. The first hypothetical question involved an individual with the ability to perform light work with the following restrictions: occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes or scaffolds; and no concentrated exposure to dangerous machinery, vibrations and unprotected heights. The VE responded that such an individual could be a dental assistant, as performed in the national economy. (R. 60). While the skills from the dental assistant job were non-transferable to other light work, other light, unskilled jobs were

available, including positions as a garment bagger, cafeteria attendant, and mail clerk. (R. 60–61).

The second hypothetical involved an individual that had the same limitations as the first hypothetical, but also required use of a cane. The VE testified that use of a cane would prevent the performance of work as a dental assistant, cafeteria attendant, and mail clerk, but work could be performed as a garment bagger, so long as the cane was not required for balance. (R. 61). The VE clarified that this opinion was not based on the *Dictionary of Occupational Titles*,[8] but rather on his twenty-four years of placing disabled workers in jobs. (R. 63–64).

For the third hypothetical, the ALJ included the same limitations as the first hypothetical without the need for a cane, but limited the individual to sedentary work. (R. 62). The prior work was eliminated, but other sedentary, unskilled positions existed, including telephone information clerk, order clerk for a food and beverage service, and document preparer.

For the fourth hypothetical, the ALJ simply added to hypothetical three the restriction of sitting no more than two hours in an eight hour day. (R. 62). The VE testified that this individual was precluded from competitive employment because sedentary jobs required sitting for more than two hours during the day. (R. 62–63).

Representative Bares asked the VE about an individual limited to sedentary work who needed to be off task to lie down for twenty percent of the work day. The VE testified that such an individual would be unable to work as they would be off task "way too frequently." The VE again clarified that his testimony regarding this hypothetical was based on experience and not the DOT. (R. 63–64).

---

[8] When determining whether unskilled, sedentary, light, and medium jobs exist in the national economy, the SSA takes administrative notice of reliable job information available from various governmental and other publications, including the *Dictionary of Occupational Titles* ("DOT"). *See* 20 C.F.R. § 404.1566(d); SSR 00-4p.

**G.      The ALJ's Written Decision**

In his January 20, 2012 decision, ALJ Sampson found that Groves suffered from severe impairments of status post cervical fusion, status post lumbar fusion, and obesity. (R. 24). He noted obesity is no longer a listed impairment, but stated that he had considered Groves' obesity in relation to her musculoskeletal, respiratory, and cardiovascular body systems. (R. 25).

The ALJ found that Groves did not have an impairment or a combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 25). He opined that Groves was capable of performing sedentary work, "except that she can never climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to dangerous machinery, vibrations, and unprotected heights."

The ALJ found that Groves' allegations were not fully supported by the "evidence of record." (R. 26). The ALJ concluded that Groves' allegations were not credible "to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 26). Relative to the objective medical evidence, the ALJ found that x-rays and MRIs showed Groves had made an almost full recovery from both of her spinal surgeries which belied her alleged limitations. (R. 26). In questioning Groves' credibility, the ALJ also noted that Dr. Singh reported all objective evidence pointed toward completely healed fusions of her neck and low back. (R. 27). In fact, Dr. Singh was unable to find the objective source for Groves' pain and noted the possibility of secondary gain issues. (R. 27). The ALJ also relied on the fact that despite Groves' complaints of left leg pain, a bilateral venous Doppler ultrasound did not reveal any evidence of deep vein thrombosis. (R. 27). The ALJ concluded that taken together, the

objective medical evidence did not support Groves' allegations of pain and other functional limitations. (R. 27).

The ALJ gave significant weight to Dr. Strong's assessment of Groves' unrestricted ability to sit, stand, and walk because the assessment was consistent with the objective medical evidence. (R. 27). The ALJ additionally gave Dr. Corcoran's physical RFC assessment "considerable weight," but did not agree with his limitation that Groves could frequently balance and reduced her to balancing only occasionally. (R. 27).

The ALJ rejected the statements from Drs. Singh and Landrum regarding Groves' functional limitations because he found that they were inconsistent with the objective medical evidence. (R. 28). Specifically, the ALJ gave Dr. Singh's opinions "very little weight" because they were "completely inconsistent" with his own treatment records, which showed that Groves had completely healed fusions, she was discharged from his care, and he considered the possibility of secondary gain issues. The ALJ rejected Dr. Landrum's opinions because he found that they were inconsistent with Dr. Landrum's own records which documented that Groves experienced cervical stiffness and pain only with certain movement extremes, and that she had adequate pain control with medications.

The ALJ relied on the VE's testimony to find that Groves could not perform her past relevant work, but she could perform a significant number of jobs in the national economy, including work as a telephone information clerk, order clerk, and document preparer. (R. 29-30). As a result, the ALJ concluded that Groves was not disabled within the meaning of the Social Security Act.

### III.  Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)–(ii).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Groves presents four primary arguments in support of remand to the agency. First, that the ALJ erred in finding Groves incredible; second, the ALJ failed to explain why Groves' obesity did not cause her further restrictions, including the inability to ambulate as required by Listing 1.02A; third, the ALJ improperly discounted the opinions of her treating physicians, Drs. Singh and Landrum, while improperly giving considerable weight to the opinions of state agents Drs. Strong and Corcoran; and finally, in light of the errors identified, the ALJ's RFC was not supported by substantial evidence.

For the reasons explained below, the Court finds that the ALJ insufficiently explained his reasons for discounting Groves' allegations and failed to provide an adequate explanation for the weight afforded to the medical opinions. As a result, the ALJ failed to adequately support his RFC determination and remand is required.

**A.      Credibility Finding**

Groves claims that the ALJ improperly discounted her statements regarding the limiting effects of her symptoms, including her pain and need to use a cane; and, the ALJ failed to consider the effects of her medications and obesity.  For the reasons discussed below, the Court finds the ALJ improperly dismissed Groves' complaints of debilitating pain based solely on the lack of objective medical evidence, and the ALJ otherwise insufficiently supported his credibility assessment.

The Commissioner is correct to point out that a reviewing Court will not overturn an ALJ's credibility finding unless it is "patently wrong." *See Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (when assessing an ALJ's credibility determination, the court "merely examine[s] whether the ALJ's determination was reasoned and supported."). However, an ALJ may not dismiss a claimant's allegations of disabling pain solely on the absence of objective medical evidence. 20 C.F.R. § 404.1529(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements"); SSR 96-7p; *see Parker v. Astrue*, 597 F.3d 920, 922–23 (7th Cir. 2010) ("It would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.' But it would be entirely sensible to say 'there is no objective medical confirmation, and this reduces my estimate of the probability that the claim is true.'"); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Here, the ALJ stated multiple times that Groves' allegations concerning the limitations caused by her pain were incredible because no objective medical evidence supported her allegations:  "[t]he evidence of record simply does not fully support the claimant's allegations"

(R. 26); the "objective medical evidence of record reveals that the claimant is not as limited as alleged, as she has made an almost full recovery from her two spinal surgeries" (R. 26); and "[t]he objective evidence simply does not support the claimant's extreme allegations regarding symptoms and functional limitations." (R. 27).  In other words, the ALJ's decision to find Groves' statements about the level of pain she experiences incredible is suspect because he based the conclusion solely on a lack of objective evidence. *See Parker*, 597 F.3d at 922. Specifically, the ALJ noted the full healing of Groves' cervical and lumbar fusions post-surgery, the lack of abnormal x-ray and electrodiagnostic evidence, and the lack of evidence of deep vein thrombosis. (R. 27). The ALJ also acknowledged that Dr. Singh "could not find the objective source of her pain, including her EMG which was normal . . . [and he] even noted possible secondary gain issues." (R. 27).  But Groves consistently complained of pain in her lower back and left leg following her cervical surgery, and she did not say that she experienced relief from the back pain following the lumbar surgery.  While it is true that Dr. Singh could not find the objective source of Groves' pain and he thought there may be some secondary gain issues in August 2011, he still referred Groves to several pain specialists indicating he thought she still needed treatment for pain.

The ALJ's conclusion that Groves was not in as much pain as she stated solely because the fusion surgeries were objectively successful is patently wrong. "As countless cases explain, the etiology of extreme pain is often unknown, and so one can't infer from the inability of a person's doctors to determine what is causing her pain that she is faking it." *Parker*, at 922 (citations omitted).  Of course the absence of verifiable medical evidence of pain is not an inadmissible consideration in a disability proceeding, but the ALJ must connect the absence of objective evidence to something like a reduced probability that Groves' claims are true or an

increased likelihood that Groves was malingering. *Parker*, 597 F.3d at 923. The ALJ did neither, and this was error.

The ALJ also noted that the objective evidence of record did not support Groves' professed need to use a cane 100% of the time. However, given Groves' history of cervical and lumbar surgery and obesity, Groves' use of a cane, even if a doctor did not recommend it, is not on its own enough to make her testimony unbelievable. *See Parker,* 597 F.3d at 922 ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription . . .".); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Moreover, even if the ALJ did not believe Groves *always* needed to use a cane, the ALJ should have explained whether he believed Groves *ever* needed to use a cane while working. This is especially important where the ALJ gave Dr. Strong's assessment "significant weight," and Dr. Strong believed Groves may need to use a cane on uneven terrain.

Additionally, the ALJ failed to discuss other record evidence which should have been considered in making his credibility assessment. Although an ALJ is not required to address every piece of evidence or testimony presented, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). In evaluating the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities, 20 C.F.R. § 404.1529(a) – (c), the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: (1) the individual's daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4)

type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) other measures taken to relieve pain or other symptoms; (7) other factors concerning functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c).

While the ALJ noted the types of treatment Groves sought (i.e. steroid injections, surgery, physical therapy, and medication) the ALJ failed to discuss:  the type (which continually changed), the dosage or the side effects of Groves' medications; whether Groves' daily activities were either consistent or inconsistent with her alleged pain and limitations; and the measures she took to relieve the pain and other symptoms.  For instance, Groves testified that her medications did not relieve all of her pain and made her extremely nauseous and drowsy.  She further indicated that her pain hindered her ability to sleep and concentrate on tasks.  And in order to reduce her pain and swelling, Groves asserted that she had to lie down for about six hours each day to elevate her foot and take the pressure off of her back.  A discussion of these alleged limiting effects was particularly important where the VE testified that an individual would be precluded from competitive employment if they could not sit for more than two hours a day or had to be off task for twenty percent of the work day. Yet the ALJ never identified whether he believed these assertions or how they would have affected her ability to sustain employment.

Additionally, under SSR 02–1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, a person who is obese may experience problems with the ability to sustain a function over time, and the combined effects of obesity with other impairments may be greater than might be expected without obesity. SSR 02–1p. Failing to acknowledge this effect may impact the ALJ's credibility determination. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).

The ALJ found that Groves' obesity was a severe impairment, but he did not explain whether obesity caused any further physical or mental limitations. On remand, the ALJ should do more than merely state that he "considered the claimant's obesity in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings as required by the Ruling" (R. 25); rather, he must explain how he reached his conclusions on whether obesity caused any further physical or mental limitations, and he must discuss whether Groves' obesity resulted in her inability to ambulate effectively, as defined in section 1.00B2b of the listings, for purposes of meeting the requirements of Listing 1.02A.

The ALJ's adverse credibility determination is simply not sufficiently supported. On remand, Groves' credibility must be assessed in light of all the evidence of record, and then it must be explained whether Groves' believed symptoms caused any further limitations,[9] including the loss of the ability to ambulate effectively.

**B.     Treating Physicians' Opinions**

Groves argues the ALJ incorrectly applied 20 C.F.R. § 404.1527(c) by failing to properly evaluate the treating doctors' medical opinions, and failing to provide a sound explanation for rejecting their opinions. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is supported by the medical findings and consistent with substantial evidence in the record. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Stigen v. Colvin,* No. 3:12-CV-249-JD, 2013 WL 3233278, at * 6 (N.D. Ind. June 25, 2013). Even when not entitled to controlling weight, the Social Security regulations dictate that the ALJ generally "give more weight to opinions from your treating sources" because they are likely the "most able to provide a detailed, longitudinal picture of your

---

[9] Since the ALJ's credibility finding was erroneous and the ALJ excluded further limitations in the RFC based on this erroneous finding, as discussed below, the Court is unable to review whether the ALJ's RFC determination properly accounted for all impairments, even those that are not severe in isolation.

medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is important, but it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ may decide to give a treating physician's opinion less than controlling weight, or discount the opinion, if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). When an ALJ discounts a treating source's opinion, he must apply other enumerated factors to determine how much weight to afford the opinion. *See* 20 C.F.R. § 404.1527(c)(2). The other factors include length of the treatment relationship and the frequency of examination, the nature and extent of the relationship, the evidentiary support for the opinion, consistency with the record as a whole, and the source's medical specialty. 20 C.F.R. § 404.1527(c)(2)–(5). Ultimately, an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates his reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has deemed this very deferential standard to be "lax." *Id.*

The ALJ discounted the opinions from Groves' treating physicians, Drs. Singh and Landrum, because the ALJ believed their opinions were inconsistent with the objective medical evidence in the record and their own treatment notes. (R. 28). But the ALJ improperly "cherry picked" evidence to reach this conclusion.

With respect to Dr. Singh, the ALJ noted that Groves' treatment began with the cervical fusion in May 2010, and concluded with her discharge from his care in August 2011. The ALJ noted that Dr. Singh was an orthopedic surgeon, and that he performed the cervical and lumbar

surgeries on Groves. He referenced Dr. Singh's notes that Groves felt great two months after her cervical surgery, and that Dr. Singh found the objective evidence pointed toward a fully healed spine (cervical and lumbar) post-surgeries. The ALJ seemed to then place much weight on the fact that as of August 2011, Dr. Singh was unable to find an objective source for Groves' pain and therefore he questioned whether there were secondary gain issues.

Therefore, in rejecting Dr. Singh's February 2011 and May 2011 medical source statements which ultimately concluded that Groves could not work, the ALJ did consider Dr. Singh's medical specialty and the nature and extent of the treating relationship. However, the ALJ failed to consider the vast majority of Dr. Singh's own treatment notes and other medical records which revealed that Groves continued to experience debilitating pain. Even after Groves' cervical discectomy and fusion in May 2010, Dr. Singh documented in June, July, and August 2010, that while her neck and arm pain were resolved, Groves continued to experience lower back and left leg pain for which physical therapy and additional surgery were recommended. And after Groves had her lumbar spine surgery in September, Dr. Singh reported that Groves had numbness in her left leg as of January 2011; and later, on May 25, 2011 and June 21, 2011, Dr. Singh documented Groves' complaints of continued lower back pain that radiated down her left leg despite her taking multiple Vicodin on a daily basis. Ultimately, Dr. Singh referred Groves to a pain management specialist. Yet, when the ALJ rejected Dr. Singh's evaluation of Groves' limited physical abilities, the ALJ never discussed whether these records were consistent with Dr. Singh's conclusion that Groves was unable to perform even simple unskilled tasks.

The same is true with respect to how the ALJ selectively omitted any discussion of the majority of Dr. Landrum's records. After noting that Dr. Landrum was a pain management

specialist, the ALJ discounted Dr. Landrum's belief that Groves could not work full time (even at the sedentary level), because of two statements which appeared in Dr. Landrum's records dated October 19, 2011 and November 28, 2011. These statements referred to the fact that Groves complained of pain and stiffness (in her neck) with movement extremes (R. 640), and her pain was adequately controlled with meds at the moment and therefore increased dosing was not required. (R. 648). But, the ALJ relied on these statements without noting that the *same* medical records revealed that Groves continued to complain of low back pain, Dr. Landrum prescribed additional pain relieving medications, and Dr. Landrum recommended that Groves consider additional surgery and interventional therapy for her lumbar spine problems. (R. 640, 648). Moreover, the ALJ omitted any reference to other records from October and November 2011, wherein Dr. Landrum recorded Groves' complaints of low back pain, documented abnormal spinal tenderness and a positive straight leg test, and prescribed more pain medication.

Thus, it was error for the ALJ to discredit the physical assessments of the treating physicians as being inconsistent with their own treatment notes, without even considering the majority of Drs. Landrum and Singh's treatment records which revealed Groves continued to suffer from debilitating pain. It was also error for the ALJ to discredit the treating physicians' assessments based on the conclusory statement that their opinions were inconsistent with other evidence of record, without specifically identifying the alleged contradictory evidence. (R. 28). The Court realizes that an ALJ need not discuss every piece of evidence in the record in rendering his decision, so long as he builds a logical bridge from the evidence to his conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding). However, in this case, the

ALJ has not bridged the gap between the evidence and the weight he afforded the treating physicians' opinions, rather, he engaged in the type of cherry picking *Denton* prohibits.  On remand, the ALJ needs to provide sufficient reasons supported by the record in order to discount the treating physicians' opinions.

**C.      State Agency Physicians' Opinions**

The ALJ gave significant weight to state agency examining physician Dr. Strong's opinion (regarding Groves' unrestricted ability to sit, stand, and walk), and the ALJ gave non-examining physician Dr. Corcoran's physical RFC assessment considerable weight. (R. 27).  The ALJ credited these opinions despite the fact that these physicians never reviewed Groves' post-December 2010 records which provided significant substantive evidence of Groves' further medical impairments (as detailed in the above factual background). *See Staggs v. Astrue*, 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011).

In addition, the ALJ gave the state agent opinions considerable weight because they were "consistent with the objective evidence of record." (R. 27).  But as previously detailed, the ALJ never referenced much of the objective evidence of record, which for the most part consisted of records from Groves' treating physicians and hospital admissions.  These errors shall be corrected on remand.

**D.      RFC Finding & Steps 4 and 5**

The RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Carradine v. Barnhart*, 360 F.3d 751, 780 n. 27 (7th Cir. 2004). This finding must be based upon all of the relevant evidence in the record, and this means that the ALJ is to consider, among other things, statements about what the claimant can still do that have been

provided by medical sources, and descriptions and observations of the claimant's limitations provided by the claimant and others. 20 C.F.R. § 404.1545(a).

Because the ALJ's credibility finding was patently wrong, and his opinion is replete with his reliance only on the facts supporting his ultimate finding that Groves could perform work at the designated RFC level, without considering evidence undermining his conclusion, a remand is required. Ultimately, the RFC determination must be supported by substantial evidence, *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), and for the reasons already discussed, here it was not.

Based on the insufficiently supported RFC determination, the ALJ found that Groves could not perform her past work (step four), but she could perform other jobs that existed in significant numbers in the national economy (step five). However, without a proper RFC evaluation, steps four and five cannot be properly analyzed. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. In other words, the Court has no way of concluding whether the hypothetical questions posed to the VE ultimately included all of Groves' limitations because there was an insufficient discussion of the record evidence supporting the ALJ's RFC determination. Moreover, to the extent some of the more restrictive hypotheticals may have included all of the limitations from which Groves suffers, i.e. the inability to sit more than two hours in an eight hour day, the VE responded that Groves would not have been able to sustain competitive employment. In essence, given the unsupported RFC determination, it is impossible for the Court to determine whether the questions posed to the VE were adequate and inclusive of all the conditions Groves alleges she suffers from, and whether the VE's testimony sufficiently

established whether Groves could in fact perform other work.[10]  *See Jelinek v. Astrue*, 662 F.3d

805, 813 (7th Cir. 2011) (noting that ALJ's must provide vocational experts with a "complete

picture of a claimant's residual functional capacity.").  For these reasons, remand is required.

### V.  Conclusion

For the aforementioned reasons, the Commissioner's decision is REMANDED for further

proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:  September 2, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[10] Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)).  This exception does not apply here, since the ALJ asked a series of increasingly restrictive hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant herself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).